IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:11-CR-228-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| ALONZO GARDNER, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on defendant's motion to suppress (D.E. 27), which includes an incorporated supporting memorandum and was accompanied by an exhibit (D.E. 27-1).[1] The government filed a memorandum in opposition (D.E. 32). The motion was referred to the undersigned for an evidentiary hearing and memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 1st D.E. dated 11 Jan. 2012). For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

On 14 July 2011, defendant was charged by criminal complaint (D.E. 1) with possession of firearms (*i.e.*, a. 223 caliber rifle and a 7.62x39 caliber rifle) and ammunition by a convicted felon on or about 13 July 2011 in violation of 18 U.S.C. § 922(g)(1). On 3 August 2011, he was indicted (D.E. 3) by a grand jury for the same offense.

On 14 December 2011, defendant filed the instant motion. It seeks suppression of all evidence taken during and derivative from a search of a residence on 13 July 2011. The undersigned conducted a hearing on the motion that began on 26 January 2012 and was

---

[1] The exhibit consisted of seven photographs which the incorporated supporting memorandum indicates are views of the house that was the subject of the searches in issue. (Def.'s Mot. 2-3 n.4). Defendant did not seek to have these photographs admitted at the hearing, but three appear to be the same as government exhibits that were admitted. Specifically, the photographs at D.E. 27-1, pp. 5, 6, and 2 correspond to Gov.'s Hrg. Exs. 2, 3, and 4, respectively.

completed on 1 February 2012. (D.E. 38, 42). At the hearing, the government presented the testimony of seven officers with the Raleigh Police Department ("RPD") who were involved in the events in question: Officer Brian Burleson ("Burleson"), Officer Daniel Egan ("Egan"), Officer Matthew Black ("Black"), Lieutenant Charles Rosa ("Rosa"), Sergeant Steve Gunter ("Gunter"), Sergeant Todd Marshburn ("Marshburn"), and Officer Todd Brown ("Brown"). (Transcript of Hearing ("Tr."), Vol. I ("Tr. I") (D.E. 68)[2]). The court also admitted eight exhibits offered by the government without objection by defendant, as follows: a report from the North Carolina Court Information System showing the history of the arrest warrant for defendant (Gov't Hrg. Ex. 1); five photographs of the house that was searched (Gov't Hrg. Exs. 2 to 6); a copy of an executed search consent form (Gov't Hrg. Ex. 8); and a photograph of items removed from the house pursuant to the searches of it (Gov't Hrg. Ex. 11). Defendant presented the testimony of two of defendant's aunts, Lillie Gardner ("Lillie") and Darlene Gardner ("Darlene"), and of Lillie's daughter and defendant's cousin, Consuelo Gardner ("Consuelo"). (Transcript of Hearing Vol. II ("Tr. II") (D.E. 105)[3]). The court admitted one exhibit offered by defendant without objection by the government, a written statement by Lillie (Def. Hrg. Ex. 4).

## **FINDINGS OF FACT**

After careful consideration of the relevant evidence of record, the court makes the following findings of fact:

---

[2] The copy of the transcript for the first day of the suppression hearing appearing at this docket entry has been redacted to remove personal identifiers pursuant to the court's 20 April 2012 Order (D.E. 55). Also, this copy is the corrected version of the redacted transcript that was originally filed at D.E. 57. The original redacted version contained pagination errors requiring the corrected version to be filed at D.E. 68.

[3] A motion by defendant to redact personal identifiers from the copy of the transcript for the second day of the suppression hearing appearing at this docket entry is currently pending. (*See* Def. Mot. to Redact (D.E. 65)).

## I. Vehicle and Foot Pursuit of Defendant

At approximately 5:00 a.m. on 13 July 2011, Burleson attempted to initiate a traffic stop of a vehicle which bore an expired license tag and matched the description of a vehicle reportedly being driven by a rape suspect. (Tr. I 8:13 to 9:19). The vehicle did not pull over, but rather began to accelerate. (Tr. I 9:17 to 10:6). Burleson pursued the vehicle until it came to a stop, and a man, later identified as defendant, exited the vehicle from the driver's side and began running. (Tr. I 10:6 to 11:5). Burleson pursued defendant on foot. (Tr. I 11:8 to 12:6). After catching up with defendant, a physical altercation ensued in which defendant attempted to choke Burleson and struck him several times. (Tr. I 12:7 to 14:14). After a lengthy struggle, and several failed attempts to get away from Burleson, defendant managed to take Burleson's flashlight and flee. (Tr. I 15:3 to 16:4). Burleson decided that it was unsafe to pursue defendant in the dark without his flashlight. (Tr. I 16:5-7). Although other officers arrived on the scene shortly thereafter, defendant was not apprehended. (Tr. I 16:15-24). Burleson sustained abrasions, bruises, and a deep laceration on his face as a result of the struggle with defendant. (Tr. I 17:3-8). Burleson returned to the police station and began writing the incident report while other officers continued to search for defendant. (Tr. I 16:25 to 17:2; 17:17-24; 24:14-17; 32:11 to 33:4).

## II. Identification of Defendant

Egan, who had been closely following Burleson during the pursuit, ran the license plate number from the car defendant had been driving and identified the owner as Cyrus Hinton ("Hinton"). (Tr. I 24:19-20; 25:10-11). Egan, along with Black, located Hinton at his home, and he agreed to go to the police station to be interviewed. (Tr. I 24:19-25; 33:5-14). Hinton told police that he gave his vehicle to a man whom he knew only by the name "Alonzo" or "Lo" for

short.  (Tr. I 25:1-4).  Hinton also told police that this person lived at the dead end of a particular street, but that he did not know the house number.  (Tr. I 25:5-8).  Using the nickname "Lo" and the address of the house, Egan was able to identify the defendant, Alonzo Gardner, as the suspect and obtain a photograph of him from a prior arrest.  (Tr. I 18:5-13; 26:10-24).

Burleson positively identified defendant from the photograph.  (Tr. I 26:16 to 27:2).  At 6:55 a.m., he began preparing the arrest warrant application with assistance from Egan.  (Tr. I 18:14 to 20:7; 27:3-7; Gov't Hrg. Ex. 1 at 1).  The application was completed at 7:35 a.m., and an arrest warrant was issued by a North Carolina magistrate at 9:55 a.m.  (Tr. I 20:7 to 21:2; Gov't Hrg. Ex. 1 at 1).

### III.    First Search of Consuelo's Residence

Egan and several officers went to the house where defendant resided to locate him and serve the arrest warrant.  (Tr. I 27:8-12; 33:15 to 34:1).  The officers positioned themselves around the house, and Egan knocked on the front door.  (Tr. I 27:13-15).  A teenaged female answered the door and allowed Egan and a few of the officers to enter the home.  (Tr. I 27:16-18; 34:2-5).  The officers then spoke with Lillie, defendant's aunt.[4]  (Tr. I 27:22 to 28:1).  Lillie told the officers that they could not search the house for defendant until the owner of the house, defendant's cousin,[5] Consuelo, returned home.  (Tr. I 28:4-8).  Approximately 10 to 15 minutes later, Consuelo arrived at the house and gave the officers consent to search the house for defendant.  (Tr. I 28:9 to 29:8; 34:12-16).  The officers, accompanied by Consuelo, searched the areas of the house in which they believed defendant could be hiding, but they did not find him.

---

[4] Although Egan testified that Lillie identified herself as defendant's grandmother (Tr. I 28:5), the court does not find that testimony credible because it is undisputed that Lillie is defendant's aunt (*see, e.g.*, Tr. II 55:9-10), and she had no motive to lie about that fact.

[5] Although Egan testified that Consuelo was identified as defendant's aunt (Tr. I 28:6-7), the court does not find that testimony credible because it is undisputed that Consuelo is defendant's cousin (*see, e.g.*, Tr. II 40:3-4; 52:1-4) and she had no motive to lie about that fact.

(Tr. I 29:9-14; 34:14-18). This search did not include the storage room, which is discussed below.

Consuelo told the officers that defendant had called her at approximately 5:20 that morning to tell her that the police were looking for him and that he was hiding in the woods and trying to get back home. (Tr. I 29:15 to 30:2; 34:19 to 35:5). She also told the officers that defendant was going to be in trouble because he was under house arrest and should have been in the home at that time. (Tr. I 29:22-24; 35:6-9). Consuelo attempted to call defendant in the presence of the officers, but he did not answer. (Tr. I 35:21 to 36:1). Unable to locate defendant, the officers returned to the police station. (Tr. I 30:3-6; 36:3-7).

## IV.   Surveillance of Consuelo's House and Arrest of Defendant's Girlfriend

Information regarding the incident with defendant, including defendant's address, was communicated to the officers beginning their shift that morning. (Tr. I 40:5-9). After departing the station at approximately 8:30 a.m., Rosa decided to drive by Consuelo's house so that he could become familiar with the area in the event further law enforcement activities at that location became necessary later that day. (Tr. I 40:9-22). At approximately 9:00 a.m., Rosa located the house, which was at the end of a dead-end street. (Tr. I 40:23 to 41:6; 42:16-18). He then took up surveillance of an intersection near the house so that he could observe any vehicles driving toward the house. (Tr. I 41:7 to 42:15).

Approximately 10 to 15 minutes after beginning surveillance, Rosa observed a taxi cab turn onto defendant's street. (Tr. I 42:19 to 43:1). He further observed that the taxi carried at least one passenger, but could not tell how many passengers were in the taxi. (Tr. I 43:2-4). Rosa moved his vehicle so that he could observe where the taxi stopped. (Tr. I 43:5-8). With his binoculars, he observed the taxi in the driveway of Consuelo's house and saw someone run from

the house and get into the taxi. (Tr. I 43:9-22). However, Rosa was unable to tell if the taxi had dropped someone off or picked someone up. (Tr. I 43:9-22; 69:19 to 70:16). As the taxi backed out of the driveway, Rosa returned his vehicle to its hiding spot. (Tr. I 43:23-25).

Believing that defendant might be in the taxi, Rosa pursued it for a short distance and then conducted a traffic stop. (Tr. I 43:17-19; 44:11-21). As he approached the taxi, Rosa observed a female passenger in the back seat. (Tr. I 45:8-12). Rosa then spoke to the male taxi driver, who confirmed that he had just come from defendant's address. (Tr. I 45:16-21). When Rosa asked the driver what his purpose was at that address, the female in the back seat stated that she had been driven there by the taxi. (Tr. I 45:22-24). Rosa observed that the fare on the taxi's meter, which he had asked the driver to stop running, was $37.00, a larger fare than Rosa had generally seen for taxi service in the downtown Raleigh area. (Tr. I 46:2-16).

When Rosa began questioning the female passenger about why she had gone to defendant's address, she became nervous and began shaking. (Tr. I 46:22 to 47:1). She told Rosa that she had gone there to meet defendant, whom she identified as her baby's father and boyfriend, and stated that she knew the police were looking for him. (Tr. I 47:2-10). When Rosa asked her if defendant was at the house, she did not respond. (Tr. I 47:12-14). Rosa then asked her to step out of the vehicle, and, as she did, she told Rosa that she had marijuana in her pocket. (Tr. I 47:21-23). She then stated that defendant knew the police were looking for him, but then did not respond further to Rosa's questions. (Tr. I 48:6-12). After another officer arrived at the scene, Rosa patted her down and located the marijuana in her pocket. (Tr. I 48:15-18). She was then arrested and taken to the police station to be interviewed. (Tr. I 48:18-24).

## V.     Second Search of Consuelo's House

Based on his observation of the taxi and interaction with defendant's girlfriend, Rosa believed that defendant might be inside the house.  (Tr. I 49:1-2; 49:9-23).  Consequently, Rosa requested additional officers and a Selective Enforcement Unit ("SEU") team, a so-called "SWAT team," to respond to the scene.    (Tr. I 49:4-6, 23-25; 54:18-19; 85:12-13). Approximately 30 minutes later, the additional officers, including the SEU team, arrived and met with Rosa in a nearby church parking lot to develop a plan for approaching Consuelo's house. (Tr. I 50:1-14; 85:14-17; 86:1-4).

At approximately 10:30 a.m., Rosa, the SEU team, the other officers, and a K-9 unit drove to the house.  (Tr. I 52:6-24; 87:16-20).  The plan was for Rosa to make contact with someone in control of the residence to obtain consent for the search and then give the SEU team the signal to exit its van.  (Tr. I 87:3-10).  With the exception of the SEU team leader, Gunter, who stepped out of the van to observe Rosa, the SEU team remained in its van while Rosa approached the house.  (Tr. I 87:21 to 88:4).  As Rosa did so, Lillie exited the house and met him in the driveway.  (Tr. I 52: 25 to 53:3; 88:5-7).  Rosa identified himself to her and told her why the police were there.  (Tr. I 53:7-14).  Lillie told Rosa that she lived in the house.  (Tr. I 53:9-10).  When Rosa asked her if defendant was inside the house, she responded that she was not sure.  (Tr. I 53:13-16).

Rosa testified credibly that Lillie then gave her consent to search for defendant, as follows:  Rosa told Lillie that he believed defendant was in the house and asked if she would consent to a search of the house and the curtilage to look for him.  (Tr. I 53:20-22; 54:7-13). Lillie told him she was unsure what was meant by "curtilage," and Rosa explained that it meant any other area of the property, such as "sheds, workshops, anywhere [defendant] could hide on

7

this property." (Tr. I 54:13-16). Lillie responded that she consented to the search, adding that she was tired of having the police coming to the house to look for defendant, that he was trouble, and that she was very upset with him. (Tr. I 53:19 to 54:17). Although Lillie and Darlene denied at the hearing that Lillie consented (Tr. II 27:2-5 (Darlene); 65:25 to 66:9 (Lillie)), the court does not find their denial credible for reasons discussed below.

Upon receiving Lillie's consent, Rosa signaled to Gunter to go ahead with the search. (Tr. I 54:18-20; 88:5-9). The SEU team then exited the van and approached the house. (Tr. I 88:11-14). Rosa gave the SEU team tactical control of the operation, and it entered the house and conducted a search of its interior for defendant. (Tr. I 54:20-21; 55:18-25; 88:11 to 89:4). The SEU team did not find defendant inside the house, but upon examining the exterior of the house, discovered a locked door on one side of the house on the lower level. (Tr. I 55:22 to 56:3; 89:5 to 90:6; *see* Gov't Hrg. Exs. 3, 4). This area ("storage room") was not accessible from the interior of the house. (Tr. II 45:15-25).

## VI.    Search of Storage Room for Defendant

Gunter and another officer, Officer Howard ("Howard"), approached Rosa and Lillie where they were still standing in the driveway to inform them about the locked door, and Gunter asked Lillie if she had a key. (Tr. I 56:5-16; 91:12-20). Lillie responded that she did not have a key. (Tr. I 91:21-22). Lillie also informed the officers that the locked side door led to an area where defendant frequently "hung out." (Tr. I 59:15-21).

Rosa believed Lillie's original consent to search the house included the storage room. (Tr. I 60:7-10). Nevertheless, Rosa and Gunter testified credibly that the police told Lillie they would like to search the storage room, and she said to go ahead and do so.[6] (Tr. I 60:11 to 61:4;

---

[6] Rosa testified that Howard spoke with Lillie. (Tr. I 60:20 to 61:2). Gunter testified that both he and Howard spoke with Lillie. (Tr. I 91:17-22). The court does not find this difference to be a material one.

91:17-22).  Lillie and Darlene denied that Lillie gave consent, but the court does not credit their testimony, as discussed below.  (Tr. II 14:17-19 (Darlene); 59:24 to 60:2 (Lillie)).

The SEU team made entry into the storage room by using a pocketknife blade to force the lock and then searched the room for defendant.  (Tr. I 61:12-13; 92:4 to 93:11).  The room consisted of a small, cluttered storage area.  (Tr. I 92:14-19; 93:6-8; Gov't Hrg. Ex. 6).  Just inside the door threshold, the SEU team found in plain sight drug paraphernalia, specifically, plastic baggies and razor blades.  (Tr. I 61:18-19; 92:14-93:4).  It also found a rifle case that appeared to have a weapon in it.  (Tr. I 93:4-16).  The rifle case was handed outside the room to Gunter pending completion of the search for defendant in the storage room.  (Tr. I 93:17-19; 97:2-7).  When it was determined that defendant was not in the storage room, the rifle case was put back in the room, just inside the door threshold.  (Tr. I 93:20-23).  The search was then suspended to seek further instructions from Rosa.  (Tr. I 93:24 to 94:2; 96:4 to 97:1; 117:19 to 118:8).

## VII.    Search of Storage Room for Weapons

After Rosa was briefed about the search of the storage room for defendant, he informed Lillie that although the police did not find defendant there, they did find drug paraphernalia and a rifle case that appeared to contain a weapon.  (Tr. I 61:16 to 62:3; 62:10-21; 63:15-18; 92:17 to 93:4; 93:10-19).  Rosa testified credibly that Lillie became enraged and was adamant that the officers remove all guns from the house.  (Tr. I 61:24 to 62:3; 62:10-21; 63:15-18).  He also testified credibly that he asked Lillie directly whether she consented to further search of the storage room and that she did consent.  (Tr. I 62:10-14).  Although Darlene denied that Lillie consented, the court finds the denial not credible for reasons discussed below.  (Tr. II 15:15-20).

Notwithstanding Lillie's oral consent, Rosa and Marshburn testified credibly that Rosa had Lillie provide written consent to search. (Tr. I 63:15-20). They both testified that Rosa asked Marshburn, who had just arrived at the scene, to obtain a consent form and take it to Lillie, who had gone back inside of the house because of the heat, and to have her sign it. (Tr. I 63:15 to 64:7; 103:18 to 104:12).

Marshburn further testified credibly as follows: He retrieved a consent form from his patrol car and knocked on the door to the house. (Tr. I 104:14-18). He explained the form to Lillie and told her that although she had already given verbal consent, they would like to have a signed form to document her consent. (Tr. I 104:20-24). When Lillie responded that she had already given her consent, he explained that she did not have to sign the form and that her verbal consent was enough. (Tr. I 104:24 to 105:6). Lillie then asked if she could call her daughter, Consuelo, and Marshburn told her she could call whomever she needed to. (Tr. I 105:7-11). He also confirmed with Lillie that she lived at the residence. (Tr. I 105:9-10). Lillie attempted to call Consuelo, but could not reach her. (Tr. I 105:12-14). Lillie then told Marshburn that she wanted them to remove any guns from the property and signed the consent form. (Tr. I 105:14-17).

The consent form is entitled "RALEIGH POLICE DEPARTMENT CONSENT SEARCH." (Gov't Hrg. Ex. 8). As completed by Lillie, it reads: "I, Lillie Gardner, do consent to the search of 2454 Jimmy Carter Way by a law enforcement officer. I am giving my consent to search knowingly and voluntarily, no threats or promises have been made to me." (Gov't Hrg. Ex. 8). The form bears the signature of "Lillie Gardner" and that of Marshburn as a witness, and is dated "7/13/11" with a time notation of "1105 hrs." (Gov't Hrg. Ex. 8; Tr. I 107:12 to 108:25).

After Lillie signed the consent form, Marshburn informed Rosa and took the form to his (Marshburn's) vehicle. (Tr. I 109:2-9). Rosa then relieved the SEU team of tactical control because it had completed its task of establishing that defendant was not there. (Tr. I 64:15-16; 64:23 to 65:6). Rosa and the remaining officers assumed control of the operation. (Tr. I 64:6-15). Rosa directed Marshburn to supervise Brown and another officer in searching the storage room. (Tr. I 65:12-16; 109:9 to 110:20). Prior to beginning the search, the officers took photographs of the interior. (Tr. I 118:17-22; Gov't Hrg. Ex. 6). During the search, the officers found the following: an assault rifle in the rifle case discovered by the SEU team; sandwich baggies with the corners missing; razor blades; a laptop computer; a digital scale; mail and forms with defendant's name; a black duffel bag containing another assault rifle; seven or eight loaded magazines for the assault rifles; and a drum magazine for the assault rifles. (Tr. I 110:22 to 111:7; 113:19 to 114:1; 118:22 to 122:1).

As the items were removed during the search, they were placed on top of or next to an air conditioning unit just outside the storage room door. (Tr. I 111:8-13; Gov't Hrg. Ex. 11). Rosa stood with Lillie while the search was being conducted. (Tr. I 65:23-25). She again became very upset when she saw the firearms and other items that were removed from the storage room. (Tr. I 66:2 to 67:12; 114:2-15). When the search was completed, the items removed were photographed and then transported to the police station to be processed. (Tr. I 122:1-19). Defendant was apprehended later that day. (Tr. I 122:21 to 123:3).

## VIII. Testimony of Defense Witnesses

As noted above, defendant presented the testimony of Consuelo, his cousin, and Lillie and Darlene, his aunts. Consuelo testified principally about the events surrounding the first search of the house, for which she was present, and defendant's living arrangements in the house,

including his use of the storage room.  Lillie and Darlene, who were present during the second search of the house, testified primarily regarding it.  While their testimony was generally consistent with that of the testifying officers, they both, as indicated, denied that Lillie gave the officers consent to search.

## **DISCUSSION**

### I.  **Applicable Legal Principles**

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures."  U.S. Const. amend. IV.  A search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  More particularly, "[i]t is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'"  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).

"In order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a 'legitimate expectation of privacy' in the invaded place."  *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (quoting *United States v. Bynum,* 604 F.3d 161, 164 (4th Cir. 2010)).[7]  "For an expectation of privacy to be legitimate, it must be objectively reasonable; in other words, it must be an expectation 'that society is prepared to recognize as reasonable.'"  *Bullard*, 645 F.3d at 242-43 (quoting *Bond v. United States,* 529 U.S.

---

[7] While courts often refer to the requirement to demonstrate a legitimate expectation of privacy as a defendant's "standing" to challenge the constitutionality of a search, the Fourth Circuit has noted that this is not the proper term for this requirement.  *See, e.g.*, *United States v. Mincey*, 321 Fed. Appx. 233, 239 n.7 (4th Cir. 2008) ("Although courts continue to use the generic term 'standing' in this context, it is clear that the proper legal inquiry is whether the individual at issue had a 'legitimate expectation of privacy' in the area searched."); *see also United States v. Powell*, 929 F. Supp. 231, 233 n.7 (S.D.W. Va. 1996) ("The use of the term 'standing' is somewhat inartful.").

334, 338 (2000)). A defendant must show that he had a legitimate expectation of privacy by a preponderance of the evidence. *United States v. Cantley*, 130 F.3d 1371, 1377 (10th Cir. 1997).

An exception to the prohibition against warrantless searches is "where valid consent to the search is given." *United States v. Digiovanni*, 650 F.3d 498, 513 (4th Cir. 2011) (citing *Schneckloth*, 412 U.S. at 219. "'Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent.'" *Id.* (quoting *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (citations and internal quotation marks omitted)). The government must establish the validity of the consent to search by a preponderance of the evidence. *Id.*

The government is not required to show that consent was given by a defendant, but "'may show that permission to search was obtained from a third party who possessed common authority over . . . the premises.'" *United States v. Shrader*, 675 F.3d 300, 306 (4th Cir. 2012) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). In *Matlock*, the Supreme Court defined "common authority" as follows:

> [The] mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

415 U.S. at 171 n.7. "If a home is occupied by multiple people, the consent exception applies 'when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant,' even if that co-occupant 'later objects to the use of evidence so obtained.'" *United States v. McArthur*, Crim. Act. No. 3:11-00055, 2012 WL 1252564, at *2 (S.D.W. Va. 13 Apr. 2012) (quoting *Georgia v. Randolph*, 547 U.S. 103, 106 (2006)). However, "spaces and items clearly under the control of only one tenant may be outside the scope of a cotenant's consent to the search." *McArthur*, 2012 WL 1252564,

at *2 (citing *Buckner*, 473 F.3d at 551). An occupant may not give consent to search an area or container set aside "exclusively for [a co-occupant's] regular use." *Reeves v. Warden, Md. Penitentiary*, 346 F.2d 915, 925 (4th Cir. 1965).

In addition, it is not required that the individual purporting to give consent have actual authority to do so. *Buckner*, 473 F.3d at 555. "Indeed, so long as the investigating officers 'reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises,' evidence obtained in such a search will not be suppressed." *Shrader*, 675 F.3d at 306 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)). In *Rodriguez*, the Supreme Court stated that that the reasonableness of an officer's decision to search is determined by the "objective standard of whether the facts available at the moment would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriquez*, 497 U.S. at 177; *see also United States. v. Powell*, 929 F. Supp. 231, 235 (S.D. W. Va. 1996) (holding that a warrantless search of a residence was unlawful where the officers unreasonably believed that one of the occupants of a house had the authority to consent where documents in the possession of the officers, had they reviewed them, indicated otherwise).

## II. Analysis

### A. Legitimate Expectation of Privacy

As indicated, the threshold issue is whether defendant had a legitimate expectation of privacy with respect to the storage room such that he is entitled to bring a challenge to the lawfulness of the searches of it. Defendant contends that the following facts demonstrate that he did: he spent a significant amount of time in the storage room; he kept most of his personal belongings there; he retreated to the storage room for privacy; both he and Consuelo considered

the room "his space"; and the storage room was locked, closed to the public, and was only accessible by a key. (Tr. II 95:16 to 96:1; 96:11-14). The court disagrees.

The permanent residents of the house were Consuelo, the owner of the house; her minor daughter; and Lillie, Consuelo's mother. Lillie paid rent to Consuelo and contributed financially to the operation of the household. (Tr. II 40:14 to 41:5). Defendant was only a temporary resident of the house, having moved there only so that he could have a stable address for the purposes of being put on house arrest. (Tr. II 39:11 to 40:13). Defendant did not pay rent and contributed no more than $100.00 to Consuelo the entire time that he resided with her. (Tr. II 41:6-15). Defendant did not have a bedroom in the house, but instead slept on a couch. (Tr. II 31:19-23; 39:7-10). He was given part of a closet and one drawer in a dresser in which to store his belongings. (Tr. II 32:12-24). Thus, the evidence shows that defendant lacked sufficient standing in the household for him to expect to have exclusive use of an area of it, such as the storage room.

Consuelo testified that defendant, with her permission, used the storage room to gain privacy from the other occupants of the house. (Tr. II 34:22 to 35:6). However, her testimony also clearly indicated defendant was not entitled to use it exclusively as to the other occupants. Consuelo testified that both her daughter and her mother could have accessed and used the storage room if they chose to do so. (Tr. II 44:5-23). Also, Consuelo did not provide defendant with a key to the storage room, or even to the house, and he had to rely on her to gain access to both. (Tr. II 35:19 to 36:11).

In addition, the location and physical properties of the storage room do not indicate that it was a room that was used as a living area, much less as a living area for one particular resident. For example, it was accessible only from the outside and not from within the living areas of the

house, thereby implying that it was not a room that was intended to be regularly accessed by the homes' occupants. Rather, it was a room intended as a common area to be used by all occupants of the house to store items that were not needed for immediate use. *See United States v. Mojica*, 442 F.2d 920, 921 (2d Cir. 1971) (holding that the occupant of a house he shared with his brother, the defendant, could consent to a search of the basement of the house because the basement was "an area not specifically set aside for the defendant"). As observed by the officers after first opening the storage room door, the interior of the storage room was cluttered with debris, further confirming that the room was, in fact, being used for storage and not as a living area.

Further, the fact that the storage room was locked, under the circumstances presented here, does not suggest that defendant was using the storage room for his own exclusive purposes as he asserts. In fact, Consuelo testified that the storage room was locked not to prevent an occupant of the house other than defendant from entering, but rather to prevent theft. (Tr. II 46:1-22); s*ee United State v. Poole*, 829 F.3d 37, No. 86-5678, 1987 WL 44671, at *3 (4th Cir. 3 Sept. 1987) (holding that there is no *per se* rule that a third party lacks authority to consent to the search of a locked object and that "[a] lock is simply one factor" and affirming the district court's denial of a motion to suppress evidence from the search of a locked trunk of an abandoned car on a third party's property, in part, because of "the everyday nature of locking a car trunk").

For the foregoing reasons, the court concludes that defendant has not demonstrated that he had a legitimate expectation of privacy as to the storage room such that he is entitled to challenge the lawfulness of the searches of it. Defendant's motion fails on this ground alone.

## B.     Consent by Lillie to the Searches of the Storage Room

Even assuming that defendant had the right to challenge the lawfulness of the searches of the storage room, the court finds that Lillie consented to the searches. The fact of Lillie's consent is established primarily by the testimony of various officers.

Specifically, Lillie's consent to the search of the storage room for defendant is established by the testimony of Rosa. As he testified, Lillie gave him verbal consent to search the house and the curtilage shortly after the SEU team and other officers arrived.

Again as Rosa testified, Lillie gave him verbal consent a second time to search the storage room for defendant after the SEU team located the locked door to it. In this instance, the consent related specifically to the storage room.

As to the search of the storage room for weapons, Rosa's and Gunter's testimony shows that Lillie consented to it verbally—in fact insisting that any weapons be removed—after being told of the discovery of a weapon in the rifle case and drug paraphernalia during the search for defendant. Marshburn's testimony, supported by Rosa's, then shows that Lille gave written consent to the search of the storage room for weapons. This consent is confirmed by the consent form she signed. Although the consent form does not state expressly that it relates to the search of the storage room for weapons, the context in which it was signed establishes unequivocally that it does.

In making these determinations, the court has considered carefully the credibility of Rosa, Gunter, and Marshburn as witnesses. The factors considered include their demeanor, their tone of voice, the internal consistency of their testimony, and the consistency of their testimony with objective and other evidence. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575

(1985). The court finds that they were credible regarding Lillie's consent to the searches (and otherwise).

Specifically, they testified in a straightforward, matter-of-fact manner. They did not come across as partisans during either direct or cross examination. In addition, they demonstrated good recall of the events about which they testified.

Moreover, their testimony regarding Lillie's consent was consistent with their actions at the house as portrayed in their own testimony and that of other officers. In particular, the credible evidence shows that the police did not proceed with either the search of the storage room for defendant or the search of it for weapons without first securing Lillie's consent.[8] In addition, as noted, the consent obtained by Marshburn is confirmed by the executed consent form.

There is no apparent motive for Rosa, Gunter, or Marshburn to have lied about obtaining Lillie's consent. Had they not obtained it, the circumstances would have made it plausible for the police to seek and obtain a search warrant, as Rosa acknowledged in his testimony. (Tr. I 67:13-24).

As indicated, Lillie, along with Darlene and Consuelo, denied that she consented to any search of the storage room, but the court does not find this testimony credible. One reason, of course, is that it conflicts with the testimony of Rosa, Gunter, and Marshburn, which is credible. But there are additional reasons.

Both Lillie and Consuelo testified that at the time of the searches, Lillie was taking medication, Valium, that caused her confusion and affected her memory. (Tr. II 42:4 to 43:12;

---

[8] In making this finding, the court rejects, for the reasons stated below, Lillie's testimony that she signed the consent form only after the searches of the storage room were completed. (Tr. II 57:4-8).

61:7 to 62:8). Lillie's capacity to accurately perceive and remember the events at issue was thereby compromised.

Further, early in her direct examination, defendant's counsel offered without objection and the court admitted a prior written statement Lillie said she had prepared about the searches of the house (Def. Hrg. Ex. 4). (Tr. II 57:9 to 58:10). As the court noted on the record, Lillie proceeded to read the entire statement to herself. (Tr. II 58:10-12). Her having done so, together with the other circumstances presented, undermines the court's confidence that she was testifying from her memory of the events in question, rather than simply reciting the contents of the statement she had just read.

Lillie's demeanor at the hearing certainly did not instill confidence in the reliability of her testimony. She spoke at times at an unusually slow pace, her voice often tailed off at the end of answers, and she at times slurred her speech. (*See, e.g.*, Tr. II 56:9-16). Her ambiguous demeanor compares unfavorably with the straightforward manner in which Rosa, Gunter, and Marshburn testified.

In addition, Lillie's hearing testimony conflicted with her prior grand jury testimony. She testified at the hearing that she did not allow the SEU team in. (Tr. II 66:4-9). However, in prior grand jury testimony, she stated, "'I allowed them to come on in so they searched.'" (Tr. II 68:22 to 69:5; *see also* Tr. II 69:6-11).

Further, Lillie's familial relationship with defendant gave her an incentive to lie to undermine the case against him. So, too, did loyalty to her daughter, who allowed defendant to stay at her home to enable him to be on house arrest.

The court also finds untrustworthy Darlene's testimony that Lillie did not give consent. Both she and Lillie testified that there were times during the search that she and Lillie were

separated (Tr. II 29:11-25; 70:5-20; 72:1-14) such that Darlene may not have been present when Lillie gave her consent. Further, Darlene's demeanor when testifying at the hearing was suggestive of less than truthful answers. When responding to direct questions by defense counsel regarding whether she or Lillie consented to the search of the storage closet, Darlene's voice became markedly quieter than when answering previous questions. (Tr. II 14:17-19).

Although Consuelo testified that Lillie did not consent to the second search of the house (Tr. II 49:16-19), which included the searches of the storage room, Consuelo admitted that she was not present during the second search (Tr. II 49:3-5).[9] The court accordingly gives this testimony no weight.

Thus, the evidence offered by defendant to show that Lillie did not consent to the searches of the storage room is unconvincing. The court concludes that, irrespective of defendant's lack of any right to object to the searches of the storage room, Lillie gave the police consent to conduct them.[10]

## C.    Authority of Lillie to Consent

Defendant argues that the police could not properly rely on any consent provided by Lillie because the police could not have reasonably deemed her to have authority to consent. Again, the record shows otherwise.

At the time the officers obtained Lillie's consent to the searches of the storage room, they knew Lillie was a resident of the house through her own statements. Her physical presence at the house tended, of course, to confirm the truthfulness of these statements. There is no credible

---

[9] After Consuelo testified that Lillie did not consent, defendant objected to the question eliciting this testimony, but did not move to strike the answer. (Tr. II 49:16 to 50:16).

[10] To the extent that the evidence presents an issue as to whether Lillie's consent was knowing and voluntary, the court finds that it was based on the same considerations just discussed. Notably, the consent form Lillie signed stated expressly that she was giving consent "knowingly and voluntarily . . . [and that] no threats or promises have been made to me." (Gov't Hrg. Ex. 8).

evidence that Lillie ever represented to the police that she lacked authority to consent to a search of the house. (*See, e.g.*, Tr. I 106:14-21). It was also reasonable for the officers to assume that Lillie, as a resident, had the authority to consent to a search of a storage room because, as discussed above, it is a common area that is typically used by all occupants of a house rather than a space that an individual would appropriate for exclusive use.

Defendant contends that it should have been apparent to the officers that defendant had an expectation of privacy in the storage room precluding reasonable reliance on Lillie's consent to search without further investigation. However, prior to their first search of the storage room, the only facts known to the police connecting it to defendant was Lillie's statement that defendant "hung out" in it. There is no evidence that she represented to any of the officers that defendant used the storage room for his own exclusive purpose. As already discussed, the information gleaned from the search of the storage room for defendant did not suggest in any way that it was used exclusively by him (or by any other person).

Defendant also asserts that the fact that Lillie did not have a key to the storage room created ambiguity about her authority. But the fact that the storage room had an entrance separate from the living area of the house implied that it was an area not intended to require regular access by the residents.[11] It would not be unusual for there to be a limited number of keys, even a single key, to such an area and for one of the residents to keep such a key and share it with other residents as needed. Accordingly, the fact that Lillie was not the person with the key to the storage room did not necessarily indicate that she lacked access to it and thereby the authority to consent to its being searched. Moreover, because the entrance to the storage room

---

[11] For this reason, the court rejects defendant's argument that the lack of general access to the storage room supports the argument that Lillie did not have the authority to consent to a search.

was exposed to the outside, it was reasonable for the police to assume that it was locked to prevent theft as opposed to keeping all of the residents but defendant from entering it.

In any event, Lillie had actual authority to consent to the searches of the storage room. Specifically, as indicated, Consuelo testified that Lillie was permitted to access the storage room. (Tr. II 44:15-24). She therefore had authority to authorize its being searched.

Finally, defendant contends that the fact that some of the officers knew that defendant was on house arrest was a fact that suggested Lillie had no apparent authority to consent to a search of the storage room. However, defendant has failed to demonstrate that this fact has any relevance to the issue of Lillie's authority.

For the foregoing reasons, the court concludes that the officers reasonably relied on the consent given by Lillie for each of the searches of the storage room. This challenge by defendant to the searches therefore fails.

### D.    The Scope of the Consent

Defendant also contends that the searches of the storage room exceeded the scope of the consent that was given by Consuelo during the first search for defendant. However, the court agrees with the government that the consent Consuelo gave to the police during the first search of the house is not relevant to the permissible scope of the searches for which Lillie gave consent when the police returned. Defendant has adduced no evidence or legal authorities establishing that Consuelo's consent precluded the later searches. Further, as concluded above, Lillie had the apparent and actual authority to independently consent to the searches. Accordingly, the court concludes that this argument by defendant is without merit. [12]

---

[12] The government makes additional alternative arguments that the searches were lawful on the grounds of exigent circumstances, *see Hunsberger v. Wood*, 570 F.3d 546, 553 (4th Cir. 2009) ("[L]aw enforcement officers in hot pursuit of a suspected felon may chase their quarry into a home without seeking judicial authorization."), and the doctrine of inevitable discovery, *see Nix v. Williams*, 467 U.S. 431, 444 (1984) (evidence seized without a warrant

**CONCLUSION**

For the foregoing reasons, the court concludes that defendant has failed to demonstrate that he had a legitimate expectation of privacy in the storage room such that he has a right to challenge the searches of it. Irrespective of defendant's lack of such right, the government has shown by a preponderance of the evidence that the searches of the storage room were conducted pursuant to and within the scope of valid consent to search. It is therefore RECOMMENDED that defendant's motion to suppress (D.E. 27) be DENIED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 9th day of August 2012.

James E. Gates
United States Magistrate Judge

---

or consent can be admitted if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means"). However, because the court concludes that the searches were pursuant to valid consent, it need not address these alternative arguments and declines to do so.